## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

KUNIO TERAMURA, HARRY SHAFFER,
STEPHANIE HOGAN, JASYLYN SHIPARSKI
and SHELLY MUSTON Each Individually and on
Behalf of All Others Similarly Situated,

                Plaintiffs,

        vs.                           Case No. 5:12-cv-05244-ELS

WALGREEN CO., d/b/a WALGREENS,

                Defendants.

## JOINT STIPULATION TO THE LEGALITY OF CLASSIFYING
## THE ASSISTANT STORE MANAGER POSITION AS EXEMPT AND TO
## DISMISSAL OF THE LAWSUIT IN ITS ENTIRETY WITH PREJUDICE

Plaintiffs Kunio Teramura, Harry Shaffer, Stephanie Hogan, Jasylyn Shiparski, and

Shelly Muston ("Plaintiffs") and Defendant Walgreen Co. ("Defendant" or "Walgreens"), by and

through their undersigned counsel, hereby jointly stipulate to the legality of Walgreens

classifying one of the positions at issue in this lawsuit, the Assistant Store Manager ("ASM")

position, as exempt from the overtime pay and minimum wage requirements of the Fair Labor

Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), pursuant to the executive

and administrative exemptions available under 29 U.S.C. § 213(a)(1).   The parties further

stipulate to dismissal of the above-styled lawsuit with prejudice, with all rights of appeal waived.

In support of these joint stipulations, the parties state as follows:

### RELEVANT PROCEDURAL BACKGROUND

1.      On November 15, 2012, Plaintiffs filed the above-styled lawsuit (the "*Teramura*

Action") on behalf of themselves and others allegedly "similarly situated" in which they asserted

violations of, among other laws, the FLSA.   *See* Compl., Dkt. 1.   Through subsequent

amendments of the Complaint, Plaintiffs limited the lawsuit to an FLSA claim for purportedly unpaid overtime compensation, in alleged violation of 29 U.S.C. § 207, with respect to Plaintiffs' and putative opt-in plaintiffs' employment in the Executive Assistant Manager ("EXA") position.  *See* Third Am. Compl., Dkt. 266.

2.     On March 7, 2013, Plaintiffs' lawsuit was conditionally certified as an FLSA collective action, and class notice was sent to putative opt-in plaintiffs to notify them of their opportunity to join the lawsuit if they so desired.  *See* Dkt. 39.  The opt-in deadline was June 20, 2013.  *See* Pls.' Mtn. Leave to File Late Consents, Dkt. 245, ¶ 4.  Plaintiffs subsequently sought leave from the Court to file the consent forms of fifty-six additional putative opt-in plaintiffs who missed the opt-in deadline by less than one month, and the Court granted the request.  *See* Dkt. 268.

3.     After the Court's order permitting fifty-six specific individuals to belatedly become opt-in plaintiffs, twenty-seven further individuals who missed the opt-in deadline brought a separate, multi-plaintiff lawsuit making almost identical substantive allegations as those raised in the *Teramura* Action but not seeking an FLSA collective action.  *See Chasko et al. v. Walgreen Co., d/b/a Walgreens*, Case No. 5:13-cv-05191-PKH (W.D. Ark.) ("*Chasko* Action"), Compl., Dkt. 1; Am. Compl., Dkt. 6; Second Am. Compl., Dkt. 8.

4.     Plaintiffs' counsel in the *Teramura* Action and the *Chasko* Action are the same.

5.     The only important substantive difference between the *Teramura* Action and the *Chasko* Action is that the plaintiffs in the *Chasko* Action alleged violations of the FLSA's overtime pay requirements with respect to their employment in both the EXA <u>and</u> ASM positions.

6.     The parties in the *Chasko* Action have filed their initial pleadings but have engaged in no discovery.

7.     The parties have, however, engaged in extensive, class-wide discovery over an eight-month period in the *Teramura* Action.  The parties' discovery included the exchange of thousands of pages of documents and information with respect to Plaintiffs and opt-in plaintiffs, written discovery responses from 203 opt-in plaintiffs, depositions of Plaintiffs and 30 opt-in plaintiffs, deposition of a Rule 30(b)(6) corporate representative of Defendant, and the exchange of written reports from the parties' respective expert witnesses.  While the ASM position was not at issue in the *Teramura* Action, the parties took discovery regarding the ASM position as well.

8.     Based on the evidence amassed during discovery, the parties agreed on two key issues raised by the *Teramura* and *Chasko* Actions.  First, the parties agreed that there are material dissimilarities among Plaintiffs and the opt-in plaintiffs in the *Teramura* Action that make collective treatment of their FLSA claims for overtime pay with respect to the EXA position unmanageable and inappropriate.   Second, the parties agreed that the evidence establishes that the ASM position that was at issue in the *Chasko* Action clearly qualifies for at least two of the FLSA's exemptions found in 29 U.S.C. § 213(a)(1)—the executive and administrative exemptions.

9.     On May 20, 2014, the *Chasko* plaintiffs and Defendant jointly stipulated to dismissal without prejudice of the *Chasko* Action, and on May 21, 2014 the Clerk of Court entered an Order of Dismissal.  *See Chasko* Action, Dkts. 14, 15.

10.     On June 6, 2014, Plaintiffs filed both an unopposed motion to permit the *Chasko* plaintiffs to join the *Teramura* Action as opt-in plaintiffs and an unopposed motion to amend the

Complaint in the *Teramura* Action further to bring FLSA overtime claims with respect to their employment in the ASM position.  *See Teramura* Action, Pls.' Unopp. Mtns., Dkts. 279, 280.

11.     On June 9, 2014, the Court granted both of Plaintiffs' unopposed motions.  *See Teramura* Action, Text Only Orders (no assigned docket numbers).

12.     On June 18, 2014, the Court granted the parties' joint motion to decertify the conditionally-certified FLSA collective action, dismissed without prejudice all opt-in plaintiffs, and authorized the issuance of notice of decertification to the opt-in plaintiffs.  *See Teramura* Action, Dkt. 284.  Thus, this lawsuit currently involves the FLSA overtime pay claims of only the five named Plaintiffs.

13.     For the reasons that follow, the parties now jointly stipulate that the ASM position held by those Plaintiffs who are current employees is properly classified by Walgreens as exempt from the FLSA's overtime pay and minimum wage requirements, pursuant to 29 U.S.C. § 213(a)(1).

## THE PARTIES' DISAGREEMENTS AS TO THE EXA POSITION

14.     The parties agree that the EXA position was the only salaried position in the non-pharmacy area, or "front end" of the store, and that EXAs were paid on a salaried basis; however, they disagree as to the specific duties Plaintiffs and the opt-in plaintiffs performed and were responsible for performing as EXAs.

15.     Defendant contends that the EXA position was properly classified as exempt from the FLSA's overtime pay and minimum wage requirements pursuant to the executive and administrative exemptions for all of the following reasons, among others:

        (a)     The EXAs' primary responsibility was to manage all front-end employees and operations.

(b)     EXAs were responsible for supervising and regularly directing the work of, training, coaching, and disciplining all hourly-paid, front-end employees, the number of whom working in any given store may range from 8 to 120.

(c)     EXAs were second in command to only the Store Manager and were responsible for not just the front-end department of the store, including all of its employees and operations, but the entire store when the Store Manager was absent.

(d)     EXAs were responsible for interviewing and hiring and recommending the termination of front-end employees.

(e)     While Plaintiffs and the opt-in plaintiffs claim to have performed different duties in different stores based on their particular Store Manager and the store's needs, the primary duty of EXAs was the performance of non-manual, management work because Walgreens trained and expected its EXAs to perform all of the following duties, among others: interviewing, selecting, and training front-end employees; setting and adjusting the work schedules of front-end employees; reviewing and analyzing store operating reports and key performance indicators to identify areas for improvement of the front end and the store as a whole; handling and resolving customer complaints; disciplining front-end employees; assigning or delegating work to front-end employees; adjusting product orders to control inventory levels; providing for the safety and security of the employees; addressing inventory loss issues and implementing inventory loss control measures; and ensuring compliance by the store's front end with all applicable laws and regulations.

(f)     The EXA's performance of, or failure to perform, the above-described duties directly affected the store's overall performance and its ability to remain profitable.  For example, if the EXA failed to order sufficient amounts of particular products, the store missed

out on valuable sales.  If the EXA ordered too much of a product, the store had to sell it at a discount down the line, thereby reducing its profitability for the store (if not causing a loss).  If the EXA failed to ensure that front-end employees provided good customer service, customers took their business to competitors' stores, but if the EXA ensured that front-end employees provided good customer service, the store developed a loyal customer base and improved sales. In a similar vein by training front-end employees well and properly planning and delegating each day's work, the EXA directly impacted the store's bottom line.

(g)   In performing the above functions, EXAs were expected to exercise extensive discretion and independent judgment with respect to matters of significance.  The specific ways in which any EXA exercised discretion and independent judgment varied based on the particular duties the EXA performed, the level of responsibility the EXA undertook in performing such duties, and the level of autonomy the Store Manager expected of the EXA.  By way of example only, some of the manners in which a particular EXA exercised discretion and independent judgment included the following:  deciding when to adjust the amount of particular products ordered up or down in response to planned promotions and sales, upcoming holidays, or customer demand; determining when and how to adjust employees' work schedules during the week to meet the needs of the store; deciding when to provide feedback to, coach, train, and discipline employees for their performance and/or behavior; deciding which applicants to interview and hire, or recommend that the Store Manager hire; deciding when and on what basis to recommend the termination of an employee's employment; determining which employees should perform particular projects and daily work tasks after considering factors such as employees' strengths and weakness, availability, and personal needs for training and

development; and implementing plans to improve front-end sales and the store's performance generally on other metrics.

(h)     Finally, in addition to their salary, EXAs were eligible to receive a bonus based on the performance of their store.  The non-exempt, front-end employees were not eligible to receive this bonus.

16.     Plaintiffs disagree with Defendant's above characterization of the EXA position and contend that they did not perform all of the above-described duties as EXAs or that such duties were their primary duties.  They contend that, as EXAs, they spent 80 to 90% of their time performing the same manual labor tasks as the hourly-paid, front-end employees.  They also claim that they did not perform many of the managerial tasks, such as creating employee work schedules and daily task lists, when their Store Manager was present and that their Store Manager worked overlapping shifts with them as much as 90% of the time.  In addition, they assert that, as EXAs, they were task-oriented, passive managers who did what their Store Manager told them to do.

17.     Because of the parties' insurmountable points of disagreement as to the duties performed by the EXA position, the parties have not entered a stipulation as to the exempt status of the EXA position; but they have agreed that Plaintiffs' previously conditionally-certified collective should be decertified under the guidance of relevant precedent.  The parties also agree that the ASM position is properly classified as exempt for the reasons outlined below.

## THE PARTIES AGREE THAT THE ASM
## POSITION IS PROPERLY CLASSIFIED AS EXEMPT

18.     Defendant eliminated the EXA position on March 31, 2013 and created the new Assistant Store Manager, or ASM, position, on April 1, 2013.[1]  Defendant made these changes as part of a broader initiative to realign the field leadership model with a shift in Walgreens' focus.[2]

19.     While most former EXAs, including Plaintiffs Teramura and Shaffer, were moved into the new ASM position on April 1, 2013, they were required to undergo additional training courses specific to their new role as ASMs.[3]

20.     Based on the evidence in this case, the parties agree that while many of the EXAs' duties are still expected of ASMs, ASMs have responsibility for performing additional exempt duties as well.

21.     Based on the evidence as to the EXA and ASM positions, the parties also agree and hereby stipulate that the ASM position is properly classified as exempt from the FLSA's overtime pay and minimum wage requirements for all of the following reasons, among others:

        (a)     ASMs are responsible for supervising and regularly directing the work of, training, coaching, and disciplining all hourly-paid, front-end employees.[4]

---

[1] *See* Ex. 2, Barfield Dep. 26:23-24 (testifying he became an ASM in April 2013); Ex. 3, Barnett Dep. 13:12-14 (same); Ex. 4, Hun Dep. 12:17-18 (same); Ex. 5, Johnson Dep. 25:3-12 (same).

[2] *See* Ex. 6, Bourdo Dep. 30:20-31:19 ("The ASM position was a newly created position to align with the mentioned—what I mentioned earlier with our new field leadership model . . . . our company changed from a fairly organic store growth strategy to really enhancing our level of service and to become more of an integrated healthcare provider; so that required, you know, new and different skills of our leaders to continue the growth of our company.").

[3] *See id*. at 32:18-33:15 ("[A]s the EXA position code was eliminated, it is my understanding that the original group of ASMs in my market were former EXAs."); *id*. at 110:9-21 (stating that "ASMs in my market attended LEAP training"); *see also* Ex. 7, Griffin Dep. 14:21-15:6 (stating that, upon moving into the ASM role, she attended training that focused more "on the happiness and healthiness, well-being of your team, engaging them to grow and to learn to succeed"); Hun Dep. 117:22-118:16 (testifying she went through a three-day LEAP training "in April where the company re-defined some of our roles and duties" to learn to focus more on "training, coaching, growing, working with the employees").

(b)      The number of hourly-paid, front-end employees varies from one store to the next but is generally in the range of eight to 120 per store.[5]

(c)      The ASM position is the only salaried position in the front end of the store and is second in command at the store-level only to the Store Manager.[6]

(d)      When the Store Manager is away from the store, the ASM oversees not only the front-end operations and employees, but the store as a whole.[7]

(e)      ASMs are responsible for interviewing and hiring,[8] completing written annual performance evaluations to be used in promotion decisions regarding,[9] and recommending the termination of front-end employees.[10]

---

[4] *See* Bourdo Dep. 86:22-24; *see also* Griffin Dep. 51:10-12 ("Q.  Do you delegate tasks to other people?  A.  Yes.  I write the work list in the morning as an ASM . . ."); Ex. 8, Lane Dep. 35:19-24 (stating, as ASM, he had the authority to train employees); Ex. 9, Olaniran Dep. 63:4-19 (admitting that she disciplined an hourly employee for accepting a post-dated check while she was an ASM).

[5] *See* Ex. 10, Feb. 3, 2014 Declaration of Expert Michael Buchanan at ¶¶ 32-35 (hereinafter "Buchanan Decl.") (where defendant's expert—based on his review of the discovery opt-ins' interrogatory responses—noted various opt-in store sizes of 10-15 employees, 24 employees, 30-35 employees, 85 employees, and 120 employees); *see also* Ex. 11, Shaffer Dep. 66:23-67:12 (testifying that 6 full-time and 2 part-time employees worked in store 9593 before he went on leave).

[6] *See* Bourdo Dep. 28:12-30:6 (stating that "every traditional retail store has in the model the ASM position in the store leadership structure" and agreeing that "[i]n addition to that current leadership, there are hourly workers in each store . . ."); *see also* Griffin Dep. 107:25-108:6 ("Q.  Do you think it's your responsibility as an EXA to be in charge of the front of the store when the store manager is not there?  A.  As a manager, period.  As an EXA or an ASM.").

[7] *See, e.g.*, Griffin Dep. 17:15-18:6 (testifying that as an ASM she is "in charge of the store" because her store manager is a community leader who "has to be out of the store all the time.  So she leaves everything—me to decide what's good for the store."); *id.* at 107:25-108:6; *see also* Johnson Dep. 96:24-97:2 (testifying that, as an ASM, she would also write notes for the pharmacy employees).

[8] *See, e.g.*, Barfield Dep. 150:16-24 (stating that she didn't interview job candidates as an EXA but did after becoming an ASM); Griffin Dep. 97:7-14 ("Q.  At Kathy's store, have you been involved in hiring?  A.  As an ASM, yes. . . .  Q.  How many times have you been involved in hiring at Kathy's store?  A.  As an ASM, quite a few.").

[9] *See, e.g.*, Griffin Dep. 119:4-7 ("Q.  Have you actually been the one that gave the performance review?  A.  Yes, as an ASM."); *id.* at 115:17-116:7 ("Q.  Do you remember recommending anyone for promotion?  A.  As an ASM for Kathy, I remember.").

       (f)     A particular ASM's daily tasks will vary from one store to the next based on the store's needs and staffing, the ASM's decisions as to which tasks to prioritize, and the management style of the ASM's Store Manager.  Nevertheless, the primary duty of ASMs is the performance of non-manual, management work because Walgreens trains and expects its ASMs to perform, and ASMs do in fact perform, the following duties, among others:  interviewing, selecting, and training front-end employees;[11] setting and adjusting the work schedules of front-end employees;[12] reviewing and analyzing store operating reports and key performance indicators to identify areas for improvement of the front end and the store as a whole;[13] completing annual performance evaluations of non-management, front-end employees;[14] handling and resolving employee and/or customer complaints or grievances;[15] disciplining front-end employees;[16] planning the work of and assigning or delegating work to front-end

---

[10] *See, e.g.*, Ex. 12, Teramura Dep. 68:2-7; *id.* at 156:22-157:1 ("Q.  You have, however, caused people to be terminated, right?  A.  I would believe so, yes.  Q.  And you have actually sat in meetings when a termination was effected, right?  A.  Yes, sir, I have.").

[11] *See, e.g.*, Barfield Dep. 150:16-24 (stating she interviewed candidates after becoming an ASM); *see also* Lane Dep. 35:19-24 (stating, as ASM, he had the authority to train employees).

[12] *See, e.g.*, Lane Dep. 35:10-19 (stating he engaged in employee scheduling as an ASM); Griffin Dep. 76:10-17 (stating that she writes employee schedules as an ASM).

[13] *See, e.g.*, Barnett Dep. 75:14-76:5 (stating in her 2012 self-evaluation, a year where she worked as an EXA and ASM, that she "look[ed] at the KPIs regularly [*i.e.*, on a daily basis] and the location maintenance performance report weekly to see what needs changing"); *id.* at 73:2-74:2 (also giving herself the highest "five star" rating in response to the statement: "[a]s a result of the efforts across the past year, the EXA/ASM contributed towards meeting the sales goals that were agreed upon for this store."); *see also* Griffin Dep. 83:16-84:8 ("[A]s ASM now, in the morning you go over the KPIs and like, now, just recently, you have to go over the loss prevention dashboard once a week, you know, once a month when it comes down, going over the operating statement and the mentoring score card and putting the binder together and, you know, just I guess, the office stuff again.").

[14] *See, e.g.*, Griffin Dep. 119:4-7 ("Q.  Have you actually been the one that gave the performance review?  A.  Yes, as an ASM.").

[15] *See, e.g.*, Ex. 13, Porter Dep. 107:21-108:6 (stating that he had responsibility for handling customer complaints as an ASM); Griffin Dep. 14:9-20; *id.* at 78:10-15 (admitting to dealing with customer complaints).

[16] *See, e.g.*, Olaniran Dep. 63:4-19 (admitting that she disciplined an hourly employee for accepting a post-dated check while she was an ASM); Lane Dep. 35:19-24 (stating, as ASM, he had the authority to

employees;[17] adjusting product orders to control inventory levels;[18] providing for the safety and security of the employees;[19] and addressing inventory loss issues and implementing inventory loss control measures.[20]

> (g)     An ASM's performance of, or failure to perform, the above-described duties directly affects the store's overall performance and its ability to remain profitable.  For example, if the ASM fails to order sufficient amounts of particular products, the store will miss out on valuable sales.[21]  If the ASM orders too much of a product, the store would likely have to sell it at a discount down the line, thereby reducing its profitability for the store (if not causing a loss).[22]  If the ASM fails to ensure that front-end employees provide good customer service, customers will take their business to competitors' stores, but if the ASM ensures that front-end

---

"send people home"); Griffin Dep. 98:22-99:6 (stating she had to get permission from her store manager before disciplining an employee as an EXA, but not as an ASM).

[17] *See, e.g.*, Barnett Dep. 59:23-61:19 (confirming in a self-evaluation that she delegated tasks to employees based on their capabilities and spent time teaching them tasks that they did not yet know how to do); Griffin Dep. 51:11-12 (stating that she wrote employee "work lists" in the morning while she was an ASM).

[18] *See, e.g.*, Ex. 14, Massengale Dep. 87:19-88:1 (stressing in her self-evaluation, for a period of time when she was both an EXA and ASM, the "importance of on-hand inventories in our daily tasks"); Barnett Dep. 73:23-75:7 (stating in her self-evaluation that "I am very strong at merchandising the store toward our customer base . . ." and admitting that she would plan inventory by anticipating what customers would buy and change out merchandise that wasn't selling); Griffin Dep. 113:2-14 (admitting that she is involved in ordering merchandise for Walgreen's "Store Within A Store" program).

[19] *See, e.g.*, Griffin Dep. 14:9-20; *id.* at 110:14-25 (stating that she witnessed customers shoplifting and had to "stop doing what I'm doing and make a decision what to do").

[20] *See, e.g.*, Barnett Dep. 73:5-13 (stating the following in reference to a self-evaluation for a time when she was an EXA and ASM: "Q.  And does merchandising also include changing what's out in the store if it's not selling?  A.  Yes. . .  Q.  And when you say that you are very strong at merchandising [in your self-evaluation] are you referring to the planning and readjusting that we're talking about?  A.  All of it, yeah.").

[21] *See, e.g.*, Ex. 15, Pipari Dep. 89:11-90:2 (testifying that one of his goals was to order enough product so that store would not miss out on potential sales); Barfield Dep. 163:13-17; Ex. 16, Revis Dep. 84:21-85:5; Ex. 17, Roberts Dep. 139:17-140:1.

[22] *See, e.g.*, Ex. 18, Oliver Dep. 108:19-109:11 (explaining that she "would definitely make less money" if she ordered too much of a product).

employees provide good customer service, the store will develop a loyal customer base and better sales.[23]  In a similar vein by training front-end employees well and properly planning and delegating each day's work, the ASM also can directly impact the store's bottom line.[24]

(h)    In performing the above functions, ASMs are expected to exercise extensive discretion and independent judgment with respect to matters of significance.  The specific ways in which any ASM exercises discretion and independent judgment will vary based on the particular duties an ASM performs, the level of responsibility the ASM undertakes in performing such duties, and the level of autonomy the Store Manager expects of the ASM.  By way of example only, some of the manners in which a particular ASM may exercise discretion and independent judgment include the following:  deciding when to adjust the amount of particular products ordered up or down in response to planned promotions and sales, upcoming holidays, or customer demand;[25] determining when and how to adjust employees' work schedules during the week to meet the needs of the store;[26] deciding when to provide feedback to, coach, train, and discipline employees for their performance and/or behavior;[27] deciding

---

[23] *See, e.g.*, Pipari Dep. 80:11-22; Ex. 19, Racosky Dep. 122:6-19; Roberts Dep. 71:4-16.

[24] *See, e.g.*, Ex. 20, Hathiram Dep. 90:4-14 (observed each employee and met with them one-on-one to help them improve their individual sales); *id.* at 120:23-121:5 (ensured photo department was always staffed so that the store did not miss potential sales in the department).

[25] *See, e.g.*, Pipari Dep. 89:11-90:2 (testifying that one of his goals was to order enough product so that store would not miss out on potential sales); *see also* Barnett Dep. 73:23-75:7 (stating she would plan inventory by anticipating what customers would buy and changing out merchandise that wasn't selling).

[26] *See, e.g.*, Griffin Dep. 75:12-76:8 ("Q.  Are there certain decisions that are unique to being a manager [such as an ASM] at Walgreens that you have to make?  A.  Maybe deciding what physical tasks have to be done, *deciding how many people need to work on a certain day*, depending on the needs of the business, depending on what ad tag day is, depending on what truck day is, depending what Smart Phone day is.") (emphasis added); *id.* at 76:10-17 (stating that she writes employees employee schedules as an ASM); *see also* Lane Dep. 35:10-19 (stating he engaged in employee scheduling as an ASM).

[27] *See, e.g.*, Lane Dep. 35:19-24 (stating that, as ASM, he had authority to train employees and "send them home"); *see also* Olaniran Dep. 63:4-19 (admitting that, as ASM, she disciplined an hourly employee).

which applicants to interview and hire;[28] determining who to recommend and when to make recommendations to promote employees;[29] deciding when and on what basis to recommend the termination of an employee's employment;[30] determining which employees should perform particular projects and daily work tasks after considering factors such as employees' strengths and weaknesses, availability, and personal needs for training and development;[31] and creating and implementing plans to improve front-end sales and the store's performance generally on other metrics.[32]

(i)    Each ASM is paid a salary each pay period that far exceeds the minimum salary amount required for the executive and administrative exemptions from the FLSA's overtime pay requirements.[33]  While the specific amount paid to each varies, the ASMs' salaries also far exceed the hourly rates paid to the non-exempt, front-end employees.[34]

---

[28] *See, e.g.*, Barfield Dep. 150:16-24 (admitting to interviewing candidates as an ASM); Griffin Dep. 97:7-14 (stating she was involved in "quite a few" hirings as ASM).

[29] *See, e.g.*, Lane Dep. 93:11-94:1 (referring to an evaluation and stating that he believed he made recommendations to his store manager as an ASM regarding who would be a good fit for a particular job); *see also* Griffin Dep. 115:17-116:7 ("Q.  Do you remember recommending anyone for promotion?  A.  As an ASM for Kathy, I remember.").

[30] *See, e.g.*, Teramura Dep. 68:2-7; *id.* at 156:22-157:1 ("Q.  You have, however, caused people to be terminated, right?  A.  I would believe so, yes.").

[31] *See, e.g.*, Hathiram Dep. 90:4-14 (observed each employee and met with them one-on-one to help them improve their individual sales); *see also* Griffin Dep. 75:12-76:8 (stating, as ASM, he "decid[ed] how many people need to work on a certain day, depending on the needs of the business, depending on what ad tag day is, depending on what truck day is, depending what Smart Phone day is").

[32] *See, e.g.*, Barnett Dep. 75:14-76:5 (stating that she "look[ed] at the KPIs regularly [*i.e.*, on a daily basis] and the location maintenance performance report weekly to see what needs changing").

[33] *See, e.g.*, Ex. 21, Morrison Dep. 10:4-7 ("Q.  Does it sound correct to you that from October 2012 through your transition to the ASM position, your salary was $51,000, $51,623?  A.  Sure.").

[34] *See, e.g.*, Teramura Dep. 245:7-19 (testifying that the hourly employees at his store earn anywhere from minimum wage (*i.e.*, $7.25/hour) plus $0.25 to around $12/hour for a longer-term employee); Ex. 22, Hogan Dep. 150:14-25 (stating she made approximately $17.00 per hour as an MGT, and she believes other MGTs make that same amount).

(j)     ASMs are paid their full salary for each week in which they perform any work, regardless of how few or many hours they work, and are not subject to any improper deductions.[35]   In the event of isolated or inadvertent deductions that would violate the salary basis requirements for exemption, Walgreens corrects the deductions immediately upon discovery pursuant to its Salaried Employee Wage Payment Policy.[36]

(k)     Finally, in addition to their salary, ASMs are eligible to receive a bonus, based on the performance of their store, that other non-exempt, front-end employees are not eligible to receive.[37]

22.     Based on all of the evidence discussed above, the parties stipulate and agree that Walgreens' ASM position is properly classified as exempt from the FLSA's overtime pay and minimum wage requirements.

## THE PARTIES' JOINT STIPULATION OF
## DISMISSAL WITH PREJUDICE

23.     Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, the parties' joint stipulation to the legality of classifying the ASM position as exempt, and the terms

---

[35] *See* Morrison Dep. 7:2-8 (acknowledging she has been an ASM since April 2013); *see also* 11:24-12:2 ("Q.  Do you believe that Walgreens ever took an improper deduction from your salary?  A.  Not that I know of.").

[36] *See* Teramura Dep. 234:3-13 (confirming access to policy); Hogan Dep. 90:12-91:14 (confirming that all EXAs had access to Store Net, where company policies were kept); *see also* Ex. 23, Muston Dep. 62:12-63:15 ("Q.  Do you recall whether you discovered that there was a deduction that needed to be corrected?  A.  Yes, because my paycheck was short, I think, two days.  Q.  And did you then go to your store manager to report that?  A.  Correct . . . *Q. And then, in fact, your deduction was corrected, right? A.  Correct.*") (emphasis added); Ex. 24, Shiparski Dep. 69:5-11 ("Q.  You never had a deduction from your pay for time that you missed away from work for less than a full day, did you?  A.  Not that I recognized.  Q.  Do you have any reason to believe that you, in fact, had that kind of deduction from your pay?  A.  No."); Morrison Dep. 11:24-12:2 (stating she is not aware of Walgreens ever taking an improper deduction from her salary).

[37] *Compare* Teramura Dep. 35:15-36:19 (Q: "Do hourly employee[s] receive bonuses?"; A: "Not that I am aware of . . .") *with id*. at 110:12-15 (Q: "But is it your understanding that in the past your bonus has been based in part on the performance of the store where you worked?  A.  Yes, sir."); *see also* Shaffer Dep. 104:6-105:4 ("Q.  Did [the hourly employees] receive any kind of bonuses?  A.  No, sir.").

of the parties' confidential settlement agreement, the parties hereby jointly stipulate to dismissal of the lawsuit in its entirety <u>with prejudice</u>, with all rights of appeal waived.  Each party shall bear his or her own attorneys' fees and costs arising from and relating to this lawsuit, except as set forth in the parties' confidential settlement agreement.  Plaintiffs represent that as a result of the settlement agreement, they have received all amounts they could possibly have recovered in this lawsuit.  The parties further stipulate that no party is the prevailing party in this action.

24.     Because this lawsuit is no longer certified as an FLSA collective action, review and approval of the parties' settlement agreement is not required.  *See Martin et al. v. Spring Break '83 Productions, L.L.C.*, 688 F.3d 247, 256-57 (5th Cir. 2012) (affirming enforcement of plaintiffs' previous private settlement of FLSA claims).

WHEREFORE, for all of the reasons set forth herein, the parties jointly stipulate to (a) the legality of Walgreens classifying its Assistant Store Manager position as exempt from the FLSA's overtime pay and minimum wage requirements pursuant to 29 U.S.C. § 213(a)(1); and (b) dismissal of the above-styled lawsuit <u>with prejudice</u>, with all rights of appeal waived, and with each party to bear its own fees and costs except as otherwise provided in the parties' confidential settlement agreement.

Respectfully submitted,

PLAINTIFFS KUNIO TERAMURA,           DEFENDANT WALGREEN CO.
HARRY SHAFFER, STEPHANIE
HOGAN, JASYLYN SHIPARSKI and
SHELLY MUSTON

<u>s/ Josh Sanford</u>                          <u>s/  Brett C. Bartlett</u>
Josh Sanford                             Brett C. Bartlett
Ark. Bar No. 2001037                     Georgia Bar No. 040510
Amber Schubert                           Louisa J. Johnson
Ark. Bar No. 2009150                     Georgia Bar No. 391805
Vanessa Kinney                           Jeffrey L. Glaser
Ark. Bar No. 2008030                     Georgia Bar No. 296454

Sanford Law Firm, PLLC
One Financial Center
650 South Shackleford, Suite 110
Little Rock, AR 72211
Telephone:  (501) 221-0088
Facsimile:  (888) 787-2040
Email:  josh@sanfordlawfirm.com
Email:  amber@sanfordlawfirm.com
Email:  vanessa@sanfordlawfirm.com

*Counsel for Plaintiffs*

Dated: June 23, 2014

SEYFARTH SHAW LLP
1075 Peachtree Street NE, Suite 2500
Atlanta, Georgia 30309
Telephone:  (404) 885-1500
Facsimile:  (404) 892-7056
Email:  bbartlett@seyfarth.com
Email:  lojohnson@seyfarth.com
Email:  jglaser@seyfarth.com

*Counsel for Defendant*